IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

MELVIN LESURE,                                    )    CASE NO.  1:19-CV-02482-JDG
                                                  )
                        Plaintiff,                )
                                                  )
              vs.                                 )    MAGISTRATE JUDGE
                                                  )    JONATHAN D. GREENBERG
COMMISSIONER OF SOCIAL SECURITY                   )
ADMINISTRATION,                                   )    **MEMORANDUM OF OPINION AND**
                                                  )    **ORDER**
                        Defendant.                )

Plaintiff Melvin Lesure ("Plaintiff" or "Lesure") challenges the final decision of Defendant Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act,42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

In September 2016, Lesure filed an application for SSI, alleging a disability onset date of July 18, 2011 and claiming he was disabled due to shattered foot and leg from gunshots, PTSD, depression, anxiety, and paranoia.  (Transcript ("Tr.") at 168, 207-08.)  The application was denied initially and upon reconsideration, and Lesure requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 168.)

On June 26, 2018, an ALJ held a hearing, during which Lesure, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On October 26, 2018, the ALJ issued a written decision

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

finding Lesure was not disabled.  (*Id.* at 168-79.)  The ALJ's decision became final on September 9, 2019, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On October 24, 2019, Lesure filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 17.)  Lesure asserts the following assignments of error:

(1) The ALJ erred in finding that Mr. Lesure can ambulate effectively, therefore substantial evidence does not support the ALJ's decision that the Plaintiff is not disabled at Step Three of the sequential process.

(2) Evidence submitted subsequent to the hearing is new and material requiring remand.

(Doc. No. 14 at 13, 17.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Lesure was born in December 1981 and was 36 years-old at the time of his administrative hearing (Tr. 178), making him a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 416.963(c). He has a limited education and is able to communicate in English.  (Tr. 178.)   He has no past relevant work.  (*Id.*)

### B.     Relevant Medical Evidence[2]

A September 10, 2015 x-ray of Lesure's left foot showed a gunshot wound around the fifth metatarsal, deformity of the fourth and fifth metatarsal heads that appeared to represent chronic remodeled fractures, and normal joint spaces.  (Tr. 426.)  No acute abnormalities were suspected but there were no comparison films.  (*Id.*)

A December 11, 2015 x-ray of Lesure's right tibia and fibula revealed deformity of the distal

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  As Lesure does not challenge any of the ALJ's findings regarding his mental impairments (Doc. No. 14), the Court's discussion of the medical evidence is further limited to Lesure's physical impairments.

fibular diaphysis with angulation and distal tibial diaphysis with multiple ballistic fragments and non-union of the distal tibia.  (*Id.* at 428.)  There had been no significant change since the previous exam.  (*Id.*)  Antony Roberts, D.O., opined the imaging showed "[s]table appearance of prior gunshot wound at remodeled distal tibia and fibula fractures."  (*Id.*)

On December 29, 2015, Lesure received treatment at Richland Correctional Institution for a foot infection.  (*Id.* at 420.)  The bottoms of his feet were dry, calloused, and painful to the touch and there was an open area between all toes, with clear drainage in some areas.  (*Id.*)  Treatment providers noted Lesure was "very much pushing for a wheelchair due to the pain caused by walking."  (*Id.*)  He was put on the DR list, prescribed foot soaks, and told to make sure his feet were dry before putting on his socks and shoes.  (*Id.*)

On January 23, 2016, Lesure saw Danny A. Hall, P.A., at Richland Correctional Institution for Naproxen and cream.  (*Id.* at 406.)  Lesure reported his right leg was still hurting and told Hall he needed more pain medication.  (*Id.* at 407.)  Hall noted Lesure had a pending orthopedic consult for a two-inch heel insert because his right leg was two inches shorter than his left.  (*Id.*)  On examination, Hall found Lesure had an antalgic gait, remote gunshot wound with "significant distal deformity," mild edema, mild tenderness to palpation, and mild right knee tenderness to palpation.  (*Id.* at 408.)

A January 26, 2016 x-ray of Lesure's right tibia and fibula showed "no significant interval change" from the December 2015 imaging.  (*Id.* at 430.)  Julie Rutledge, M.D., opined the fracture lines remained conspicuous, which was "worrisome for non-union fractures."  (*Id.*)  Dr. Rutledge found stable alignment since the reference examination.  (*Id.*)

On March 22, 2016, Lesure saw Alfred Granson, M.D., at Richland Correctional Institution for a review of his restrictions.  (*Id.* at 390.)  Dr. Granson noted Lesure wanted a no standing order and that he "[w]as in wheelchair secondary to severly [sic] deformed RLE."  (*Id.*)  On examination, Dr. Granson

3

found an antalgic gait but no clubbing or edema of the extremities.  (*Id.* at 391.)  Dr. Granson also noted right lower extremity weakness.  (*Id.* at 390.)  Dr. Granson assessed Lesure with pain in joint, lower leg, and osteoarthritis involving more than one site.  (*Id.*)  Dr. Granson stated he would give a "no standing/BB/BR/Cane x one year."  (*Id.*)  Dr. Granson also wrote, "D/C wheelchair."  (*Id.*)

That same day, Lesure also saw Thomas Kidd, DPM, for follow up.  (*Id.* at 393.)  Dr. Kidd conducted a "focused exam" that found Lesure's right leg was two inches short because of a prior gunshot wound and maceration between his lesser toes.  (*Id.*)  Dr. Kidd noted Lesure needed a two-inch heel and sole elevation; shoes had been ordered but Lesure never got them.  (*Id.*)  Dr. Kidd wrote, "got boots and put insole in and short limb feels better DC FMC ortho for shoe correction."  (*Id.*)

On April 15, 2016, Lesure saw Rachel Wheeler, CNP, at Richland Correctional Institution for follow up regarding complaints of rectal pain.  (*Id.* at 373.)  Wheeler noted Lesure reported no pain in his legs when walking and found he had no problems with balance, muscle strength, or sensation.  (*Id.*)  On examination, Wheeler found Lesure had an antalgic gait but no clubbing or edema of the extremities.  (*Id.* at 374.)

By October 1, 2016, Lesure developed a methicillin resistant staphylococcus aureus ("MRSA") skin infection in his right foot.  (*Id.* at 702.)  Megan E. Dible, R.N., noted that Lesure at one point was up in the hallway using the phone.  (*Id.* at 703.)  At another point, she noted he was awake in his cell and pacing about.  (*Id.*)  The admission diagnosis from that day states, "non compliance foe mrsa protocol. 041.12."  (*Id.* at 704.)

On October 31, 2016, Lesure was seen by nursing staff at Richland Correctional Institution as he had redeveloped an open wound.  (*Id.* at 659.)  The treatment notes reflect his MRSA infection had resolved on October 3, 2016.  (*Id.*)

On November 21, 2016, Lesure saw Opoku Aduse, C.N.P., at Richland Correctional Institution for a right wound culture follow up and complaints of a painful foot.  (*Id.* at 645.)  On examination, CNP Aduse found right ankle deformity, maceration of skin between the third and fourth, as well as the fourth and fifth, right toes with greenish drainage and a foul odor.  (*Id.* at 646.)  The wound culture was positive for MRSA.  (*Id.*)

On January 1, 2017, Lesure went to South Pointe Hospital emergency department complaining of right foot pain and rash.  (*Id.* at 715.)  Lesure reported he had been having a rash and pain between his toes for the past seven months, and the medication he had been given in jail did not work.  (*Id.*)  Lesure reported increased drainage, odor, and pain over the past week.  (*Id.*)  Lesure described the pain as aching and rated his pain as a 10/10.  (*Id.* at 717.)  His wound was dressed with facial tissue upon arrival.  (*Id.*)  Lesure also complained of nausea, vomiting, and diarrhea, but told staff he had family members with similar issues.  (*Id.* at 715.)  A physical examination revealed no leg swelling, deformity of the right leg related to an old gunshot wound, rash on the second, third, and fourth toes on the right with some erythema and macerated skin between the toes with superficial ulcers.  (*Id.* at 716.)  Lesure moved all extremities and had normal strength and range of motion, but also had a gait problem.  (*Id.* at 716, 719.)  Staff found tenderness of the right foot, but not of the right ankle.  (*Id.* at 719.)  No drainage was found on examination.  (*Id.*)  An x-ray showed soft tissue swelling, but there was no evidence of osteomyelitis.  (*Id.* at 716.)  After evaluation in the emergency department, treatment providers admitted Lesure for further management.  (*Id.* at 715.)  Lesure's diagnoses included right foot cellulitis, webspace infection with fungus, and psoriasis.  (*Id.* at 716, 724.)  Treatment providers discharged Lesure on January 4, 2017.  (*Id.* at 724.)

On January 27, 2017, Lesure returned to South Pointe Hospital.  (*Id.* at 1327.)  He reported he had "faithfully" used the antifungal medication and antibiotics and thought his foot was healed until the week

before, when he started to get cellulitis in two toes.  (*Id.*)  Lesure reported washing his feet three times a day and keeping his feet dry, but once his medication ran out it came back.  (*Id.* at 1327-28.)  A physical examination revealed erythema of the skin, tenderness, and deformity.  (*Id.* at 1329.)  Providers gave Lesure medication and ordered him to follow up with podiatry and the wound healing center in one week.  (*Id.* at 1329.)  The treatment notes reflect suspected malunion of Lesure's right leg and noted he was to follow up with South Pointe orthopedics.  (*Id.* at 1330.)

On February 1, 2017, Lesure saw David Ko, D.O., for maceration between his toes.  (*Id.* at 1325.)  Lesure reported taking his Bactrim "faithfully" and soaking and airing his feet twice a day with a baking soda solution.  (*Id.*)  Lesure told Dr. Ko he changed his socks twice a day but had not been putting on the Tefla pads as often as he would like, and when he took the pads off his toes, there was fluid and pus.  (*Id.*)  Dr. Ko noted the scent was beginning to subside and the swelling was going down.  (*Id.*)  Dr. Ko determined Lesure's foot maceration was resolving.  (*Id.* at 1327.)

On February 20, 2017, Lesure saw Herschel Pickholtz, Ph.D., for a consultative psychological examination.  (*Id.* at 1383.)  Dr. Pickholtz noted Lesure was sitting in the waiting room in a wheelchair but walked slowly to the evaluation room with a cane.  (*Id.* at 1384, 1387.)  Lesure told Dr. Pickholtz the reason he could not work was because he "'cannot walk and cannot do much and have physical problems.'"  (*Id.* at 1385.)  Lesure reported taking care of his personal hygiene and grooming himself and that he cooked dinner twice a month.  (*Id.* at 1389.)

On May 5, 2017, Lesure saw Thomas Schalcosky, D.O. for complaints of sharp, stabbing pain rated as a 9/10 that radiated from his right foot up to his knee.  (*Id.* at 1424.)  Dr. Schalcosky noted Lesure was scheduled for surgery with Dr. Damien Billow on June 1, 2017.  (*Id.*)  Lesure reported he was frustrated that he had not been given any pain medication except for bridging Tylenol #3.  (*Id.*)  On examination, Dr. Schalcosky found right ankle deformity and tenderness.  (*Id.* at 1427.)  Dr. Schalcosky

noted Lesure had a prominent deformity of the right lower extremity involving both the fibula and tibia and that Lesure complained of "a lot of discomfort" when placing weight on this extremity.  (*Id.*)  Dr. Schalcosky also found maceration between the toes of both feet but no discharge.  (*Id.*)  Dr. Schalcosky encouraged him to use a walker, and Lesure also asked for a wheelchair prescription because his previous one was stolen from his porch.  (*Id.* at 1428.)  Dr. Schalcosky provided enough pain medication to get Lesure to his surgery on June 1, 2017 and prescribed topical medication for the infection in his feet.  (*Id.*)

On June 1, 2017, Lesure underwent open treatment of the right distal shaft fracture nonunion with autograft from separate incision using a right femur reamer irrigator aspirator, a right fibular osteotomy, removal of two bullets from the right tibia, and a right iliac crest bone marrow aspiration.  (*Id.* at 1476-77.)  During this admission, Lesure received balance training, as well as wheelchair management and training.  (*Id.* at 1485.)  When Lesure was discharged on June 5, 2017, he was to be non-weight bearing and was to use a wheelchair as needed.  (*Id.* at 1489-90.)

On June 9, 2017, Lesure went to the Cleveland Clinic Main Campus emergency department for complaints of right leg pain.  (*Id.* at 1438.)  Lesure reported he had been walking with his walker when the walker bent and he fell, landing on his right leg.  (*Id.*)  Lesure rated his pain as a 10/10.  (*Id.*)  Treatment notes from this date state that before his June 1, 2017 surgery, Lesure was wheelchair bound because of persistent pain in his right leg.  (*Id.* at 1440.)  On examination, treatment providers found sensation intact in the right lower extremity, staples intact to right knee, and cast intact.  (*Id.* at 1438.)  X-rays of the right lower extremity showed "essentially unchaged [sic] post-surgical anatomy from prior intraoperative imaging."  (*Id.* at 1443.)  Lesure was discharged and instructed to continue his previously prescribed pain medication and use the RICE treatment for his leg.  (*Id.*)  Lesure's condition was noted to be "improved and stable."  (*Id.*)

On July 11, 2017, Dr. Damien Billow, Lesure's orthopedic surgeon, wrote a letter explaining that Lesure was recovering from his surgery and had been instructed to be non-weight bearing for two months from the date of surgery, and because of this Lesure had been unable to attend court on June 27, 2017. (*Id.* at 1500.)

On July 26, 2017, Lesure saw Dr. Billow for follow up.  (*Id.* at 1502.)  Lesure continued to complain of pain over his right ankle and knee.  (*Id.*)  Lesure described the pain as burning pain shooting down his leg into his foot.  (*Id.*)  Lesure told Dr. Billow he had tried Neurontin in the past and it did not help.  (*Id.*)  Lesure said he was getting minimal pain relief from Flexeril and Norco.  (*Id.*)  Dr. Billow noted Lesure had not been to any physical therapy.  (*Id.*)  On examination, Dr. Billow found tenderness to palpation over the knee, ankle, and fracture, as well as a decreased motion secondary to pain.  (*Id.*)  Dr. Billow ordered Lesure "to advance physical therapy to weightbearing as tolerant and range of motion as tolerated of his right lower extremity."  (*Id.*)  Lesure was to follow up in two months with x-rays.  (*Id.*)

On August 10, 2017, Lesure went to South Pointe Hospital for treatment of a right leg wound.  (*Id.* at 1657.)   Jacqueline Tulodzieski, M.D., noted Lesure had been doing well and started some weightbearing on his right lower extremity.  (*Id.*)  When seen recently at the Orthopedic office, providers noticed a developing wound on his right leg at one of the surgical incision sites.  (*Id.*)  Cultures of the wound showed proteus mirabillis, klebsiella, strep agalactiae, and staph aureus.  (*Id.*)  Lesure reported he had not had much pain in the area and had been compliant with his post-operative care.  (*Id.*)  On examination, Dr. Tulodzieski found mild edema to the right lower extremity, especially at the level of the deformity, a wound that extended down to the bone, and mild pain to palpation of the wound.  (*Id.* at 1658.)  Dr. Tulodzieski diagnosed cellulitis and a surgical dehiscence of the right medial lower extremity was performed.  (*Id.*)  The wound appeared to be stable at the time.  (*Id.*)  Dr. Tulodzieski told Lesure the

importance of compression of the area between his knee to his ankle to help with edema.  (*Id.*)  Lesure was to follow up in one week.  (*Id.*)

On August 15, 2017, Lesure went to the Cleveland Clinic Main Campus emergency room for "excruciating pain" in his right leg and an inability to bear weight on his right leg.  (*Id.* at 1579.)  Lesure reported taking Percocet without pain relief.  (*Id.*)  Labs taken in the ER showed an elevated white blood cell count.  (*Id.*)  X-rays revealed no significant post-surgical and post-traumatic change, but CT imaging showed soft tissue edema/infiltration.  (*Id.*)  Treatment providers admitted Lesure for infected ORIF site, sepsis, and lactic acidosis.  (*Id.*)  On examination, Lesure presented with soft tissue swelling of the lower right leg, a three centimeter by one centimeter wound to the right lower leg, granulated tissue with a small amount of serosanguineous drainage, no streaking erythema, soft calf compartments, no swelling or erythema of the foot, and intact sensation of the foot.  (*Id.* at 1580.)  On August 18, 2017, Lesure underwent a physical therapy evaluation.  (*Id.* at 1596.)  Nicole Best, PT, found Lesure tolerated the full session, was progressing as expected, and had good rehab potential.  (*Id.*)  Although Lesure initially told Best he could not get up and could not put weight on his leg, Best noted Lesure was weight-bearing as tolerated and encouraged use of his left lower extremity with walking.  (*Id.* at 1597.)  Lesure was discharged home with a wheeled walker that day.  (*Id.* at 1596, 1605.)  Shaza Azmat, M.D., noted in discharge records that Lesure had continued right leg pain that was not consistent with exam findings. (*Id.*)

On August 23, 2017, Lesure saw Dr. Billow for continued complaints of pain and spasms along his entire right leg, as well as drainage.  (*Id.* at 1510.)  On examination, Dr. Billow found minimal swelling with wrinkles present, a 2x2 centimeter wound along the distal tibia incision that appeared to go down to the bone, no drainage or erythema, tenderness to palpation over the hip, ankle, hardware, and fracture, and decreased motion secondary to pain.  (*Id.*)  Dr. Billow determined the x-rays showed maintained

alignment, no interval displacement, intact hardware, callous formation, and healing fracture.  (*Id.*)  Dr. Billow wanted to admit Lesure that day for debridement of the non-healing ulceration and possible skin graft.  (*Id.* at 1510.)  Another option Dr. Billow discussed with Lesure was hardware removal and a below the knee amputation.  (*Id.* at 1511.)  Lesure wanted to salvage his leg and declined being admitted that day.  (*Id.*)  Lesure told Dr. Billow he would come in the next morning for surgery.  (*Id.*)  Dr. Billow noted Lesure was weight-bearing as tolerated.  (*Id.*)

That same day, Dr. Billow wrote a letter stating Lesure was under his care for "right tibia non-union - wound infection" and he could not return to work until after a follow up appointment in approximately eight weeks.  (*Id.* at 1499.)

On August 24, 2017, Lesure underwent excisional debridement of skin and subcutaneous tissue down to and including the bone of the right distal tibia.  (*Id.* at 1610.)  Dr. Billow's post-operative plan contemplated Lesure would be weight-bearing as tolerated on the right leg.  (*Id.* at 1611.)  An examination on August 26, 2017, revealed 5+ lower extremity muscle strength.  (*Id.* at 1632.)  On August 27, 2017, Lesure was not in his room "despite multiple verbal orders/reminders that he must stay in inpatient room/floor upon initial daily assessment" but was otherwise doing well post-operation.  (*Id.*)  Lesure underwent a second excisional debridement on August 28, 2017.  (*Id.*)  On August 29, 2017, Lesure was not in his room "despite multiple verbal orders/reminders that he must stay in inpatient room/floor."  (*Id.* at 1633.)  On August 31, 2017, Lesure underwent a pedicled posterior tibial artery perforator flap and a split-thickness graft.  (*Id.* at 1629.)  That same day, treatment providers gave Lesure a peripheral nerve block as he complained his pain was poorly controlled.  (*Id.* at 1632.)  On September 2, 2017, a PICC line was placed for non-compatible medications.  (*Id.* at 1633.)  On September 5, 2017, treatment providers placed a physical therapy order for activity assessment.  (*Id.*)  Again, the treatment notes reflect Lesure was not in his room "despite multiple verbal orders/reminders that he must stay in inpatient room/floor."

10

(*Id.*)  On September 6, 2017, Lesure again was not in his room "despite multiple verbal orders/reminders that he must stay in inpatient room/floor."  (*Id.*)  On September 7, 2017, Lesure's PICC line was removed and he was discharged home with "extensive wound care instructions."  (*Id.*)

On September 9, 2017, Lesure went to Cleveland Clinic Main Campus emergency room complaining of 10/10 right leg pain and swelling for one day.  (*Id.* at 1520.)  Lesure had not been wearing his brace as instructed because it caused swelling and pain.  (*Id.* at 1520, 1523.)  For two days he had increasing discharge and then the day before he developed increased swelling, pain, and numbness.  (*Id.* at 1522.)  On examination, treatment providers found Lesure's strength and skin graft was intact, but the surgical site had some warmth, redness, and edema, and there was brown discharge from the skin graft site.  (*Id.* at 1524.)  A September 10, 2017 ultrasound revealed diffuse soft tissue thickening and subcutaneous edema, as well as fluid collection.  (*Id.* at 1536-37.)  Treatment providers drained the fluid.  (*Id.* at 1643.)  It was determined Lesure's fabricated splint was too tight, so a plaster splint with a window in the dressing for flap evaluation was made instead and Lesure was given crutches.  (*Id.* at 1531.)

On September 11, 2017, Lesure called the Cleveland Clinic reporting a return of swelling, and in addition, when applying his splint to his leg and cutting out a window for his flap, Lesure cut himself with scissors.  (*Id.* at 1642.)  Nicholas Sinclair, M.D., found the flap to be viable and repaired the laceration in the flap.  (*Id.* at 1646.)

On September 13, 2017, Lesure went to the Cleveland Clinic with increased pain, fluid collection to/around his flap, and swelling in his right leg.  (*Id.* at 1649, 1651.)  Lesure described the pain as severe, sharp, and constant.  (*Id.* at 1651.)  Movement aggravated his pain, while pain medication alleviated it.  (*Id.*)  Lesure denied any reinjury to his leg.  (*Id.*)  On examination, there was "significant swelling and erythema of what appears to be the flap site (difficult to tell what is old and was related to yesterday's laceration)."  (*Id.*)  Pranteeth Reddy, M.D., found Lesure was able to move his ankle and toes, but it was

somewhat limited by pain.  (*Id.*)  Dr. Reddy was "highly concerned for wound infection" and wanted to admit Lesure, but he refused and left against medical advice.  (*Id.* at 1653-54.)

A September 15, 2017 treatment note by Dr. Schwarz stated the distal tip of Lesure's flap was necrotic.  (*Id.* at 1547.)

On September 19, 2017, Lesure went to South Pointe Hospital for right leg pain and an STD check.  (*Id.* at 1664.)  Brianne Cicchiani, D.O., noted Lesure was supposed to have a wound check by his physician that day but he had missed the appointment.  (*Id.*)  Lesure reported his last wound check was one week ago and he was told everything looked good and there was no infection.  (*Id.*)  Lesure told Dr. Cicchiani he had pain today because he had been on his feet and had not been home to take his Percocet. (*Id.*)  Lesure stated he had been taking his antibiotics as prescribed and that he changed the dressing on his leg twice a day.  (*Id.*)  Lesure denied any changes in the wound's appearance since last week.  (*Id.*)  On examination, Dr. Cicchiani found normal range of motion, tenderness over the skin graft, a three-centimeter area of necrotic tissue on the interior aspect of the wound, no foul drainage, no surrounding warmth, no erythema, and no edema.  (*Id.* at 1666.)  Dr. Cicchiani discharged Lesure with instructions to follow up with his primary care physician in two to three days or return to the emergency room if his symptoms worsened and new symptoms developed.  (*Id.* at 1667.)

A September 27, 2017 x-ray of Lesure's right tibia and fibula revealed an intramedullary nail transversing a fracture of the distal tibia with hypertrophic callus formation, no endosteal healing or bridging callus, a transverse fracture of the fibula at the same level with hypertrophic callus that did not bridge and with no endosteal healing, osteopenic bones distal to the fracture, and degenerative changes of the tibiotalar joint.  (*Id.* at 1509.)

That same day, Tony Abdulkarim, P.A., a wrote a letter stating Lesure was unable to work due to his fracture and was unable to bear weight and stand on his right leg.  (*Id.* at 1655.)  Lesure was to be reassessed in two months.  (*Id.*)

On October 4, 2017, Lesure went to South Pointe Hospital for complaints of right lower leg and left foot pain.  (*Id.* at 1683.)  Garrett LaSalle, M.D., noted Lesure had poor wound healing and was scheduled to undergo wound vac placement by plastic surgery.  (*Id.*)  Lesure reported warmth in his right leg compared to his left, severe pain, and a "significantly decreased range of motion" in his right ankle.  (*Id.*)  Dr. LaSalle noted Lesure's pain appeared to be chronic, nociceptive, and neuropathic in nature.  (*Id.* at 1685.)  On examination, Dr. LaSalle found decreased range of motion and pain to light touch/pressure.  (*Id.*)  Dr. LaSalle told Lesure chronic opioid therapy worsens chronic pain, and that "his addiction history has likely resulted in altered limbic system/reward system function, placing him at increased risk for drug craving/maladaptive behaviors with ongoing use of opioids."  (*Id.*)  Dr. LaSalle noted that further complicating Lesure's condition was significant Vitamin D deficiency.  (*Id.*)  Dr. LaSalle referred Lesure to PT/OT to include desensitization therapy, prescribed high-dose Vitamin D, and offered Lesure a lumbar synthetic blockade, which Lesure refused.  (*Id.* at 1686.)

On October 5, 2017, Lesure underwent debridement of his right lower extremity partial flap necrosis and placement of home going negative pressure wound therapy.  (*Id.* at 1726.)  Dr. Schwarz noted Lesure had "trouble with compliance in wound care."  (*Id.* at 1727.)

On October 19, 2017, Lesure saw Teny John, M.D., for an Infection Diseases outpatient visit.  (*Id.* at 1714.)  Dr. John noted Lesure's October 5, 2017 wound culture grew E. coli, and Lesure was brought in that day to the Infectious Diseases clinic to start IV treatment for the E. coli infection.  (*Id.*)  On examination, Dr. John found Lesure had a normal gait.  (*Id.* at 1716.)  Dr. John placed a PICC line in the

clinic that day, administered the first dose of medication, and planned to treat the infection for two weeks. (*Id.* at 1717.)

On November 14, 2017, Lesure arrived by ambulance at South Pointe Hospital with complaints of right leg and bilateral foot pain.  (*Id.* at 1757.)  Lesure reported his feet hurt and he thought he had an infection in between his toes.  (*Id.*)  Lesure also wanted to be tested for an STD.  (*Id.*)  Lesure told Dr. Cicchiani three days ago he began having right leg pain and foul-smelling drainage.  (*Id.* at 1759.)  On examination, Dr. Cicchiani found tenderness of the right anterior tibia/fibula, normal strength, and 5/5 grip strength, dorsiflexion, and plantarflexion.  (*Id.* at 1761.)  Dr. Cicchiani noted the wound on Lesure's right leg had a foul-smelling discharge.  (*Id.*)

An x-ray taken that day revealed two lower interlocking screws fractured at their intersection with the intramedullary rod in the tibia, non-union of the distal tibial and fibular fractures, a soft tissue defect in the medial aspect of the distal calf, and multiple metallic foreign bodies and surgical clips, but no evidence of osteomyelitis.  (*Id.* at 1762.)

Dr. Cicchiani took a wound culture.  (*Id.*)  Lesure's CBC panel was significant for slight leukocytosis.  (*Id.* at 1762-63.)  Treatment notes reflect Lesure spoke to his plastic surgeon on November 7, 2017 and was instructed to go to the emergency room at main campus for evaluation of his leg pain and foul-smelling drainage.  (*Id.* at 1763.)  Lesure did not do so, waiting until a week later to go to South Pointe's emergency department.  (*Id.*)  Mr. Lesure's wound appeared to be infected and he was transported to Cleveland Clinic's main campus with lifecare as Lesure's surgeon was at the main campus. (*Id.* at 1763-64.)

Upon arrival at main campus, Dr. Schwarz noted Lesure was a "[v]ery non-compliant patient." (*Id.* at 1911.)  Lesure reported doing twice daily dry dressings and that he had been using crutches so as to

14

not put any weight on his right leg.  (*Id.*)  On examination, Dr. Schwarz found the soft tissue did not appear infected.  (*Id.* at 1916.)  Dr. Schwarz noted a bedside debridement would be attempted.  (*Id.*)

Treatment notes from a consult by Dr. Billow that same day state that since Lesure's June 5, 2017 operation, Lesure had been "non-compliant with wound-care and weight bearing status."  (*Id.* at 1917.) Dr. Billow stated the new x-ray showed both screws were broken with incomplete but improved callous formation since a September 27, 2017 x-ray.  (*Id.*)  Dr. Billow noted Lesure "has supposedly been NWB to RLE using crutches" and determined the wound did not appear infected, but cultures were pending. (*Id.*)  On examination. Dr. Billow found a full and painless range of motion in the right ankle, as well as "5/5 EHL, DF, PF."  (*Id.* at 1917, 1920.)  No further orthopedic intervention was planned at that time.  (*Id.* at 1921.)

On November 17, 2017, Lesure went to the Plastics Department at Cleveland Clinic.  (*Id.* at 1815.) Lesure demanded pain medication and was agitated and threatening.  (*Id.*)  Lesure also demanded providers take care of his wound and wanted to know why his leg was not healing.  (*Id.*) Tonianne Grobmeyer, PA-C, noted Lesure had a history of non-compliance, had not been home for home care visits multiple times, and did not have his phone on much of the time so it was difficult to reach him.  (*Id.*)  On examination, Grobmeyer found a right lower extremity wound with necrosis at the top margin and a five-centimeter by five-centimeter open wound at the base of the muscle flap.  (*Id.*)  The packing was in place. (*Id.*)  Grobmeyer told Lesure to continue with wet to dry dressing changes daily.  (*Id.*)

On December 1, 2017, Lesure saw Dr. Schwarz.  (*Id.* at 1820.)  Lesure complained of 10/10 right leg pain, demanded pain medications, demanded Dr. Schwarz take care of his wound, and wanted to know why his leg was not healing.  (*Id.*)  On examination, Dr. Schwarz determined Lesure's wound infections were improving.  (*Id.*)  Dr. Schwarz noted Lesure's history of non-compliance with his care.  (*Id.*) Treatment notes show Lesure had an appointment scheduled with South Pointe wound care on December

5, 2017.  (*Id.*)  Dr. Schwarz instructed Lesure to continue with wet to dry dressing daily, follow up with Infections Diseases and Pain Management, and return to the office in two weeks.  (*Id.*)

On December 8, 2017, Lesure went to the Cleveland Clinic main campus emergency room after developing "intense leg throbbing and pain" that day.  (*Id.* at 1828.)  Lesure also complained of right leg cramping for the past two days and worsening swelling where the surgical flap was located.  (*Id.* at 1829-30.)  Lesure reported a "'red' drainage" from the wound at home, but no drainage was found on examination.  (*Id.* at 1828.)  Lesure also reported fevers at home, but he did not have a fever on examination.  (*Id.*)  Lesure denied any further injury to the leg.  (*Id.* at 1833.)  Lesure told treatment providers the pain was worse with movement and palpation and that he had been taking Advil with minimal relief.  (*Id.*)  Treatment providers noted there was no need for antibiotics.  (*Id.*)  On examination, it was noted the ulceration was without "purulence or surrounding erythema or streaks," the ulceration was not warm to the touch, and the flap appeared well-healed, although there was a "small questionable area of fluctulence of the lower portion."  (*Id.* at 1835.)  An x-ray of the right leg showed "unchanged posttraumatic and postsurgical changes of the distal tibia and fibula" that was stable from the previous x-ray.  (*Id.* at 1836.)  Lesure's labs did not support infection.  (*Id.*)  An ultrasound revealed "a phlegmon versus granulation tissue."  (*Id.* at 1831.)  Plastic surgery came, probed the wound, and provided wound care.  (*Id.*)  Lesure was diagnosed with "right leg pain and chronic ulcer of the right leg, limited to breakdown of skin."  (*Id.* at 1830.)  Treatment providers instructed Lesure to follow up with infectious disease and plastic surgery.  (*Id.* at 1831.)  Lesure left the department in a wheelchair.  (*Id.* at 1830.)

On December 22, 2017, Lesure saw Grobmeyer for follow up.  (*Id.* at 1862.)  Lesure presented in a wheelchair, was very agitated, and told Grobmeyer he was in severe pain.  (*Id.*)  Lesure reported he was changing his dressing every three days.  (*Id.*)  On examination, Grobmeyer found an open wound on the right calf, small areas of sloughing at the perimeter of the wound, "islands of granulation tissue," no bone

exposure, and slight edema surrounding the wound.  (*Id.* at 1864.)  Grobmeyer told Lesure to perform wet to dry dressing until Monday, follow up with Dr. Billow, continue with Infectious Diseases at South Pointe, and follow up with Plastics in three weeks.  (*Id.* at 1865.)

On December 29, 2017, Lesure saw Kristin Englund, M.D., at the Cleveland Clinic.  (*Id.* at 1871.) Dr. Englund noted Lesure had a wound care appointment yesterday but did not make it.  (*Id.*)  Lesure complained of persistent right leg pain and reported he had been changing the dressing on his leg "only once every 3 days."  (*Id.*)  Lesure also complained of right foot pain and reported putting antibiotic ointment between his toes.  (*Id.*)  On examination, Dr. Englund found with skin flap "mostly healed" with a small two by two-centimeter area of open wound with a "scant yellow discharge on the surface."  (*Id.* at 1872.)  Dr. Englund also found "[g]ood granulation tissue," no visible bone, and no erythema.  (*Id.*)  The right foot had "marked tinea pedis" and Dr. Englund noted Lesure's sock was "wet, dirty, [and] stained from antibiotic ointment."  (*Id.*)  Even with Lesure's "[p]oor follow up at wound care" and only changing his dressing every three days, Lesure's wound appeared "superficial with only minimal elevation of the CRP and no evidence of deeper infection on plain films."  (*Id.* at 1872-73.)  Dr. Englund instructed Lesure to change his wound dressing daily.  (*Id.* at 1873.)

Lesure received emergency treatment that same day for flu-like symptoms.  (*Id.* at 1898.) Treatment notes reflect Lesure had a "[d]ecreased ROM secondary to GSW to lower extremity" and that Lesure was discharged in a wheelchair.  (*Id.* at 1886, 1898.)

On January 10, 2018, Lesure saw Dr. Billows for complaints of continued lower extremity pain. (*Id.* at 1903.)  Dr. Billows noted Lesure was doing local wound care but off antibiotics.  (*Id.*)  On examination, Dr. Billows found a skin flap with good healing proximally and granulating wound at the distal apex, no exposed bone, no erythema, and no expressible discharge.  (*Id.*)  Dr. Billows also found sensation intact at the L4-S1 distribution, as well as "5/5 DF/EHL/PF."  (*Id.*)  Lesure also had tenderness

17

to palpation over the ankle, hardware, and fracture, as well as a decreased range of motion secondary to pain.  (*Id.*)  Upon reviewing Lesure's x-rays, Dr. Billow determined there was maintained alignment with no interval displacement, the distal screws were broken, and while there was some callous, the incomplete fracture line was still visible.  (*Id.*)  Dr. Billows wrote as follows:

> Pt has persistent nonunion. Has been noncompliant postoperatively with activity wound care and antibiotics etc. regarding treatment of the postoperative course. He was discharged from home care due to lack of compliance availability. Discussed with Dr. Schwarz and number times but her options. Currently undergoing local wound care once he is improving. He is off antibiotics. CRP on December 22 0.9. No obvious pus or drainage on exam today. Patient is not a candidate in my opinion for any further limb salvage due to ongoing social and compliance issues and exhaustive large reconstructive attempts with both myself and Dr. Schwarz. Do not think he would heal a revision flap. Discussed with him that Dr. Schwarz and I have offered everything we can with fixation bone grafting flap coverage . . . Discussed other option would be below-knee amputation maintain her knee joint and getting the prothesis. He said "fuck that" and wants another opinion, threatened to call Ombudsman, etc. Offered to help him set up another opinion with Drs. Patterson or Berkowitz or another trauma surgeon at another hospital. Dr. Somich at UH.

(*Id.*)  Dr. Billows also noted Lesure was weight-bearing as tolerated.  (*Id.*)

A January 19, 2018 MRI showed a "[s]ubcutaneous soft tissue abscess at the medial aspect of the distal tibia," a minimal amount of fluid around the proximal interlocking screw, "[a]ssociated subcutaneous cellulitis medially," fractured interlocking screws, "[h]ypertrophic nonunion of the distal tibial diaphyseal fracture," and "[h]ypertrophic nonunion of the distal fibular diaphyseal fracture."  (*Id.* at 2010.)

On February 5, 2018, Lesure saw John Sontich, M.D., to rule out an amputation.  (*Id.* at 1933.)  Dr. Sontich noted he had first seen Lesure in the hospital for a consultation on January 19, 2018.  (*Id.*)  Dr. Sontich noted further Lesure was seen on January 16, 2018 after a fall at home and was discharged on Naprosyn.  (*Id.*)  Lesure returned on January 18, 2018 with complaints of increasing pain and tingling, and it was found he had infected nonunion of the right tibia.  (*Id.*)  In the hospital, Lesure had "gross leakage

18

from the tibia" and the "tibia screws had failed distally." (*Id.*) At that time, Dr. Sontich offered a below-knee amputation but Lesure was not ready to make that decision at the time. (*Id.*) Dr. Sontich explained trying to save his leg would result in a year of time-consuming and painful treatment. (*Id.*) A below-knee amputation would be more reasonable, a quick operation, and would most likely eliminate infection at the level of his osteomyelitis. (*Id.*)

On examination, Dr. Sontich found a small amount of drainage and swelling and Lesure could move his ankle about 20 degrees. (*Id.*) Lesure reported he was still in a significant amount of pain. (*Id.*) Dr. Sontich again went over his treatment options, but Lesure did not make a decision at that time. (*Id.* at 1934.) Dr. Sontich diagnosed chronic osteomyelitis of the right tibia with draining sinus, open fracture of the tibia shaft, type III, with nonunion, and type III open displaced spiral fracture of the right tibia shaft with nonunion. (*Id.* at 1935.)

On February 15, 2018, Lesure went to South Pointe for a general checkup. (*Id.* at 1798.) Richard Garwood, D.O., noted Lesure had an appointment with wound care on February 13, 2018 but did not attend. (*Id.*) Lesure reported his PICC line his right arm had come out or was about to come out. (*Id.*) While he had gone to the emergency room the day before, he left without being seen because of the long wait. (*Id.*) Lesure told Dr. Garwood he was planning to go back that day to have his PICC line put back in because he had missed some IV antibiotic doses for osteomyelitis involving his nonunion fracture. (*Id.*) Dr. Garwood told Lesure if would be compliant as much as he possibly could, then it may provide for better outcomes. (*Id.*) Dr. Garwood noted Lesure spent most of his day in the wheelchair and in the seated position, but that a leg was missing from the right side of the wheelchair. (*Id.*)

On examination, Dr. Garwood found Lesure's skin graft was "edematous and 'puffy'" but there was no open wound and the skin was intact. (*Id.* at 1801.) He also had some maceration between his toes. (*Id.* at 1802.) Dr. Garwood diagnosed Lesure with osteomyelitis of the ankle or foot, a closed tibia/fibula

19

fracture with nonunion on the right, and maceration of the skin.  (*Id.* at 1803.)  Dr. Garwood prescribed a wide heavy-duty wheelchair since Lesure's wheelchair leg was broken, and Lesure was to elevate his leg. (*Id.*)

On April 13, 2018, Lesure saw Ankit Maheshwari, M.D., for complaints of constant pain below the knee, as well as a burning sensation and hypersensitivity.  (*Id.* at 1992.)  Movement exacerbated the pain, while rest and oxycodone alleviated it.  (*Id.*)  Dr. Maheshwari noted Lesure was restricted from weight-bearing activities and was in a wheelchair.  (*Id.* at 1992, 1994.)  Lesure's gait was grossly normal. (*Id.* at 1994.)  Dr. Maheshwari found a hypertrophic bony abnormality and an open wound at the inferior aspect of the skin graft site, without drainage or purulence, but with edema and warmth of the graft site. (*Id.*)  However, Lesure demonstrated 5/5 motor strength and muscle strength of the lower extremities bilaterally and equally.  (*Id.* at 1995.)  Dr. Maheshwari noted Lesure was still deciding between limb salvage surgery and a below-knee amputation.  (*Id.*)  Dr. Maheshwari stated Lesure was compliant with treatment recommendations and was using his medication as prescribed.  (*Id.*)  On his medication, Lesure reported "adequate functioning, pain down from severe in intensity to mild to moderate and complete independence with activities of daily living."  (*Id.*)  Dr. Maheshwari noted Lesure continued to "experience severe nociceptive and neuropathic pain" in his right leg with ongoing osteomyelitis.  (*Id.*)  Dr Maheshwari discussed reducing Lesure's oxycodone dosage.  (*Id.*)

Treatment noted dated that same day and authored by Dr. Sontich reflect Lesure had "not really followed up" with him for the past several months.  (*Id.* at 1997.)  Dr. Sontich also noted Lesure had "significant problems with inability to bear weight" and pain.  (*Id.*)

On June 8, 2018, Lesure underwent a functional capacity evaluation at South Pointe Hospital.  (*Id.* at 2024.)  Christine Ontko, OTR/L, determined Lesure had the ability to perform within the sedentary physical demand category.  (*Id.*)  Ontko opined Lesure could not work full time because he could only

20

work for six hours and six minutes a day when taking into account his need to alternate sitting and standing.  (*Id.*)  Ontko further opined "the unskilled sedentary occupational base is significantly eroded because [Lesure] is unable to stand for 1 hour and 45 minutes, and sit at least 2 hours at one time." (*Id.*)

Regarding Lesure's consistency of effort, Ontko opined as follows:

> During objective functional testing, Mr. Lesure demonstrated consistent effort throughout 31.2% of this test which would suggest significant observational and evidence based contradictions resulting in consistency of effort discrepancies, self-limiting behaviors, and/or sub-maximal effort. The overall results of this evaluation do not represent a true and accurate representation of Mr. Lesure's overall physical capabilities. The functional results of this evaluation represent a minimal level of functioning for Mr. Lesure. During objective functional testing, the items that were inconsistent resulting in self limiting behavior/sub-maximal effort included muscle testing inconsistencies, right hand grip strength inconsistencies, left hand grip strength inconsistencies, right five span grip inconsistencies, left five span grip inconsistencies, right five span versus right grip inconsistencies, left five span versus right grip inconsistencies, right grip strength inconsistencies secondary to higher right rapid grip exchange results, left grip strength testing inconsistencies secondary to higher left rapid grip exchange results, right five span grip strength testing inconsistencies secondary to higher right rapid grip exchange results and left five span grip strength testing inconsistencies secondary to higher left rapid grip exchange results.

(*Id.* at 2024-25.)

Regarding the reliability of Lesure's pain rating, Ontko opined as follows:

> Throughout objective functional testing, Mr. Lesure reported reliable pain ratings 33.3% of the time which would suggest unreliable functional pain ratings. The functional abilities demonstrated in this evaluation do not represent a true and accurate representation of Mr. Lesure's overall physical capabilities secondary to the unreliable pain reports. The results of this evaluation represent a minimal level of functioning for Mr. Lesure. During objective functional testing, the pain related testing items that were unreliable included: poor psychodynamics during McGill Pain Questionnaire and Mr. Lesure did not report pain symptoms consistent with the functional pain scale.

(*Id.* at 2025.)

Ontko determined Lesure had no skills that were compatible with sedentary work, and he would need to finish his GED and attend additional training before returning to work.  (*Id.*)  Ontko also opined

21

that due to Lesure's "injury and pain, he lacks the stamina for full time work, spending more than ½ of each day laying down."  (*Id.*)  Ontko further opined that Lesure had the ability to stand for one minute at one time and total.  (*Id.*)

Following lower extremity muscle testing, Ontko stated Lesure was "unable to bear weight on his right leg due to pain and foot positioning. His right foot is maintained in a [sic] inverted posture and he is unable to evert to place the foot flat on the floor. NMT was not completed due to pain level and inability to tolerate."  (*Id.* at 2027.)  Ontko also noted Lesure was unable to walk.  (*Id.* at 2030.)

## C.    State Agency Reports

On October 20, 2016, Dimitri Teague, M.D., determined Lesure had the residual functional capacity to lift and/or carry 20 pounds occasionally  and 10 pounds frequently, stand and/or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and frequently push/pull with the right lower extremity.  (*Id.* at 213.)  Dr. Teague opined Lesure could occasionally climb ramps/stairs, kneel, crouch, and crawl, and frequently balance and stoop.  (*Id.*)  Lesure could never climb ladders, ropes, or scaffolds.  (*Id.*)  Dr. Teague further opined Lesure needed to avoid even moderate exposure to hazards and must avoid unprotected heights and scaffolds.  (*Id.* at 214.)

On February 28, 2017, Leigh Thomas, M.D, on reconsideration agreed with Dr. Teague's findings regarding Lesure's physical residual functional capacity.  (*Id.* at 227-29.)

## D.    Hearing Testimony

During the June 26, 2018 hearing, Lesure testified to the following:

- He went to school through the tenth grade but never got his GED.  (*Id.* at 189.)  He took the pre-GED test "and stuff like that" up until he found out he had osteomyelitis.  (*Id.* at 190.)  He could not sit very long, and it interfered with him doing his schoolwork.  (*Id.*)

- He cannot sit too long because he gets "annoying, agonizing pains" that run through his bottom half and on the side of his legs.  (*Id.*)  The pain is unbearable at times. (*Id.*)  He has to lay down or lay on his side to try to alleviate the pain.  (*Id.*)  He also

22

has pain in his left foot.  (*Id.*)  He can sit for maybe 20-25 minutes before he begins to squirm and fidget and feeling like he has to stand up a little bit on his left leg to stretch and shake it out.  (*Id.*)

- He has been in a wheelchair "off and on" since 2011.  (*Id.* at 191.)  Since his surgeries, he has been confined to a wheelchair and cannot walk.  (*Id.*)  He cannot stand too long.  (*Id.*)  He cannot stand or walk at all.  (*Id.*)  He has an open wound on his leg that has been there since June 1, 2017 and is still open and still drains.  (*Id.*)  He falls if he tried to walk on his leg.  (*Id.* at 192.)  He cannot bear weight on it at all.  (*Id.*)  He has been able to put weight on it since July 2011, but he was using crutches.  (*Id.*)  He has been alternating between crutches and the wheelchair to get around since 2011.  (*Id.*)  He also has a cane and brace, but the brace was "imbedding" into his wound, and he was told not to use it.  (*Id.*)  He had to go back to the wheelchair.  (*Id.*)  He also had a walker that he used in the house.  (*Id.*)  He only uses the walker to transfer himself to bed or someplace like that.  (*Id.*)  If he takes one or two steps, he's leaning or he's falling.  (*Id.* at 193.)  He fell a few weeks ago and had to go to the hospital.  (*Id.*)  He injured his leg and his shoulder.  (*Id.*)

- He mostly stays in bed.  (*Id.*)  He's either in bed or in the wheelchair when he "can stand it," but most of the time he is laying down with his leg propped up or he is on his side "trying to shake [himself] to sleep."  (*Id.*)  He does not know what it is to have a normal, productive day.  (*Id.*)  His kids do everything for him.  (*Id.*)  They cook his food, wash his clothes, clean the house, help him bathe, and help him out a lot.  (*Id.*)  He spends most of his day sitting in the house researching his infection and sleeping.  (*Id.*)  He is unable to dress himself.  (*Id.* at 200.)

- His treatment options are amputation or another attempt to save his leg by using stem cells to try and regrow the bone.  (*Id.* at 195.)  He is leaning more towards amputation.  (*Id.*)  He is in pain all day and is never out of pain.  (*Id.*)  His pain is an 8/10 every day.  (*Id.* at 196.)  It is never less than an eight.  (*Id.*)  Even Percocet doesn't work at times.  (*Id.*)  He has an open wound all the way down to the bone that has been there since June 2017.  (*Id.*)

- He did not think it was true that he had been non-compliant with his treatment.  (*Id.* at 196-97.)  He had a lot of "misunderstandings" with the home health aides that came to his house.  (*Id.* at 197.)  Also, the company he relied on for transportation shut down and he was unable to make it to his appointments.  (*Id.*)

- He plays Scrabble, Blackjack, and other games on his phone and reads a lot about religion and his condition.  (*Id.* at 199.)

- When his pain does up to 10/10, he doubles up on his pain medication or he goes to the emergency room.  (*Id.*)  In a month, his pain is a ten probably 25 out of 31 days.  (*Id.* at 200.)

The ALJ stated Lesure did not have any past work that rose to the level of substantial gainful activity.  (*Id.* at 201.)  The ALJ then posed the following hypothetical question:

> [W]ould you consider a person of the claimant's age, education, with work, but not past relevant work and who has the capacity of -- first for light work with the ability to frequently push and pull with the right lower extremity, the ability to climb ramps and stairs occasionally, never climb ladders, ropes, or scaffolds, frequently balance and stoop, occasionally kneel, crouch, crawl, who would have to avoid exposure to hazards such as industrial machinery and unprotected heights, who has the capacity to work in a low stress environment with non-strict production standards and infrequent changes and who has the capacity for superficial contact with coworkers and the public. Would you know of jobs that individual could perform?

(*Id.*)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as: cleaner, housekeeping; cashier; and folder.  (*Id.* at 201-02.)

The ALJ then modified the hypothetical to add a requirement to use a wheelchair or other ambulatory aid for standing and walking.  (*Id.* at 202.)  The VE testified the hypothetical individual could not perform the jobs previously identified, but could perform work that was predominately seated, such as: sorter; cashier where the person could be seated; and ticket checker.  (*Id.* at 202-03.)  The VE reduced the number of available cashier jobs in the national economy to reflect the positions where a person could be seated.  (*Id.* at 202.)  Lesure's counsel clarified that the jobs identified in response to the second hypothetical could be performed by someone in a wheelchair.  (*Id.* at 203.)  The VE testified yes, they were sedentary jobs.  (*Id.*)  In response to questioning from counsel, the VE testified there would be no work for a person who was absent three or more times a month because of their symptoms or who was off-task 20% or more of the workday.  (*Id.* at 203-04.)

24

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.110, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. § 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. § 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. § 416.920(g).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since September 22, 2016, the application date (20 CFR 416.971 *et seq.*).

2.     The claimant has the following severe impairments: dysfunction of major joints, osteoarthrosis and allied disorders, obesity, anxiety disorder, and substance addiction disorder (20 CFR 416.920(c)).

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he can frequently push and pull with the right lower extremity; he can climb ramps and stairs occasionally; he can never climb ladders, ropes, or scaffolds; he can frequently balance and stoop; he can occasionally kneel, crouch, and crawl; he would have to avoid exposure to hazards such as industrial machinery and unprotected heights; he has the capacity to work in a low stress environment with non-strict production standards and infrequent changes; he has the capacity for superficial contact with coworkers and the public; and he is required to use a wheelchair or other ambulatory aid for standing and walking.

5.     The claimant has no past relevant work (20 CFR 416.965).

6.     The claimant was born on December **, 1981 and was 34 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.     The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since September 22, 2016, the date the application was filed (20 CFR 416.920(g)).

(Tr. 170-79.)

# V.     STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).

Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of*

27

*Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.    First Assignment of Error: Step Three

Lesure argues the ALJ erred at Step Three by finding Lesure could ambulate effectively and therefore did not meet the criteria of Listings 1.02 and 1.03.  (Doc. No. 14 at 14.)  Lesure asserts the record evidence "proves" he "has an extreme limitation in his ability to walk, requiring the use of a wheelchair, walker, or two crutches."  (*Id.*)  In addition, Lesure maintains that because the ALJ recognized that he required a wheelchair or ambulatory aid for standing and walking means "[t]here is apparently no dispute that Mr. Lesure is unable to ambulate effectively."  (*Id.* at 17.)  Finally, Lesure argues that the ALJ's "citation" to his muscle strength, that he was well nourished, "his ability to periodically bear weight, and her observation that he could stand up during the hearing (A.R. 174), does not address the issue of effective ambulation."  (Doc. No. 14 at 17.)

The Commissioner argues substantial evidence supports the ALJ's Step Three finding.  (Doc. No. 17 at 7.)

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the Listing of Impairments.  *See* 20 C.F.R. § 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. § 416.925(a).  Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. § 416.925(c)(3).  It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment.  *See e.g. Lett v. Colvin*, No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015).  A claimant must satisfy all of the criteria to "meet" the listing.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).  A claimant is also disabled if his impairment is the medical equivalent of a listing, 20 C.F.R. § 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011).  In order to

conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision.  *Id.* at

416-17.  *See also Harvey v. Comm'r of Soc. Sec.*, No. 16-3266, 2017 WL 4216585, at *5 (6th Cir. March

6, 2017) ("In assessing whether a claimant meets a Listing, the ALJ must 'actually evaluate the evidence,'

compare it to the requirements of the relevant Listing, and provide an 'explained conclusion, in order to

facilitate meaningful judicial review.'" (quoting *Reynolds*, 424 F. App'x at 416); *Joseph v. Comm'r of*

*Soc. Sec.*, 741 F. App'x 306, 311 (6th Cir. 2018) (same).

Here, Lesure's challenge to the ALJ's Step Three analysis is limited to Listings 1.02 (major

dysfunction of a joint) and 1.03 (reconstructive surgery or surgical arthrodesis of a major weight-bearing

joint).  These Listings are defined as follows:

> **1.02 *Major dysfunction of a joint(s) (due to any cause)***: Characterized by
> gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous
> ankylosis, instability) and chronic joint pain and stiffness with signs of
> limitation of motion or other abnormal motion of the affected joint(s), and
> findings on appropriate medically acceptable imaging of joint space
> narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> > A. Involvement of one major peripheral weight-bearing joint (i.e., hip,
> > knee, or ankle), resulting in inability to ambulate effectively, as defined in
> > 1.00B2b[.]
>
> * * *
>
> **1.03 *Reconstructive surgery or surgical arthrodesis of a major weight-***
> ***bearing joint***, with inability to ambulate effectively, as defined in 1.00B2b,
> and return to effective ambulation did not occur, or is not expected to occur,
> within 12 months of onset.

20 C.F.R. § 404, Subpt. P, App'x 1.

At Step Two, the ALJ determined Lesure suffered from the severe impairments of dysfunction of

major joints, osteoarthrosis and allied disorders, and obesity.  (Tr. 170.)  The ALJ then determined, at Step

Three, that Lesure's impairments did not meet or equal Listings 1.02 or 1.03, explaining as follows:

> Particular attention was given to medical listing 1.02 for major dysfunction of
> a joint. However, the specified criteria required of the listing was not
> demonstrated by the available medical evidence. Specifically, the listing

requires gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and finding on appropriate medically acceptable imaging of joint space narrowing, bony destruction or ankylosis of the affected joint. The listing also requires involvement of one major peripheral weight-bearing joint resulting in inability to ambulate effectively as defined in l.00B2b. In this case, the evidence does not demonstrate that the claimant has the degree of difficulty in ambulating as defined in l.00B2b, as described in greater detail in the medical record review, below.

Listing 1.03 requires that the claimant demonstrate reconstructive surgery or surgical arthrodesis of a major weight-bearing joint with inability to ambulate effectively. The evidence does not demonstrate that the claimant has the requisite degree of difficulty in ambulating as required by this listing, as described greater detail in the medical record review, below.

(*Id.* at 170-71.)

In determining Lesure's RFC, the ALJ found as follows:

On one hand, the claimant reported continuing pain in his lower left extremity and exhibited tenderness to palpation as well as decreased motion secondary to pain. He was assessed as having persistent nonunion, though he was noted to be noncompliant postoperatively with activity, wound care, and antibiotics. Doctors advised him that options were either to continue local wound care or perform below knee amputation. He was at times noted as treatment compliant. He was observed as using a wheelchair, though he had difficulty maneuvering the device. He was at times noted to have decreased range of motion secondary to his lower extremity gunshot wound. He was also consistently described as obese (e.g. Exhibits 1F, 2F/15, 9F/22, l0F, 14F/39, 16F/78, 20F/l, 23F/72, 25F/l, 27F/10/12).

Conversely, the claimant was noted to have been noncompliant postoperatively with activity, wound care, and antibiotics, and was discharged from home care due to a lack of compliance availability. Despite his leg wound and nonunion, his gait was described as grossly normal and he exhibited equal, 5/5 muscle strength of the bilateral lower extremities. He demonstrated a normal musculoskeletal range of motion. He was noted as appearing well developed and well nourished. He exhibited normal neurological strength and 5/5 grip strength. He was at times noted as doing well and starting weightbearing in the wake of surgery. He was also noted to have "complete independence" with activities of daily living. While the claimant testified that can hardly stand at all, the undersigned witnessed him standing at hearing on multiple occasions with no apparent problem. At a physical evaluation, the claimant was noted as functioning in the sedentary level, though to demonstrate consistent effort only 31.2% of the time, thus suggesting significant contradictions, and it was concluded that the results of

31

the evaluation did not represent a true and accurate representation of his functioning (e.g. Exhibits 9F/4, 14F/39, 18F/2, 21F/7/30, 25F/l, 27F/9/10, 28F, Hearing Testimony).

In sum, while the claimant was assessed with persistent nonunion post lower extremity surgery, uses an ambulatory device, was at times noted as having decreased ranges of motion, and is obese, he was also - in contradiction to the intensity of his allegations - at times noted to be treatment noncompliant, his gait was at times described as normal, he exhibited 5/5 muscle and grip strength, he was noted to have independence in his activities of daily living, he was noted as demonstrating subpar effort on examination, and the undersigned witnessed him standing on multiple occasions with no apparent problem (e.g. Exhibits 1F, 2F/15, 9F/4/22, l0F, 14F/39, 16F/78, 18F/2, 20F/1, 21F/7/30, 23F/72, 25F/1, 27F/9/10/12, 28F, Hearing Testimony). Taking the above into consideration, the undersigned finds that the claimant is limited to light work except he can frequently push and pull with the right lower extremity; he can climb ramps and stairs occasionally; he can never climb ladders, ropes, or scaffolds; he can frequently balance and stoop; he can occasionally kneel, crouch, and crawl; he would have to avoid exposure to hazards such as industrial machinery and unprotected heights; and he must be allowed to use a wheelchair or other ambulatory aid for standing and walking.

(*Id.* at 174.)

The ALJ also weighed relevant opinion evidence as follows:

Opinion evidence

The undersigned considered the opinions of Disability Determination Services consultants Dmitri Teague, MD, and Leigh Thomas, MD, who opined that the claimant can work at the less than light exertion level (Exhibits IA, 3A). These doctors are steeped in Social Security rules and regulations and had the opportunity to review the record at the time they rendered their opinions. Those opinions are also consistent with the longitudinal record, including that while the claimant was assessed with persistent nonunion post lower extremity surgery, uses an ambulatory device, was at times noted as having decreased ranges of motion, and is obese, he was also - in contradiction to the intensity of his allegations - at times noted to be treatment noncompliant, his gait was at times described as normal, he exhibited 5/5 muscle and grip strength, he was noted to have independence in his activities of daily living, he was noted as demonstrating subpar effort on examination, and the undersigned witnessed him standing on multiple occasions with no apparent problem (e.g. Exhibits 1F, 2F/15, 9F/4/22, l0F, 14F/39, 16F/78, 18F/2, 20F/1, 21F/7/30, 23F/72, 25F/1, 27F/9/10/12, 28F, Hearing Testimony).

The undersigned considered the opinion Christine Ontko, OTR/L, who noted that the claimant tested as functioning in the sedentary level, though he demonstrated consistent effort only 31.2% of the time, thus suggesting significant contradictions, and it was concluded that the results of the evaluation did not represent a true and accurate representation of his functioning (Exhibit 28F).

The undersigned accords this opinion partial weight. While it is difficult for the undersigned to assign greater weight due to Ms. Ontko indicating that the evaluation did not represent an accurate representation of the claimant's functioning due to his lack of consistent effort, the opinion does carry some weight in that it reinforces inconsistencies between the claimant's allegations and the longitudinal record, as described in the analysis of the Disability Determination Services consultant opinions, above.

The undersigned considered the various treatment opinions and notes of John Sontich, MD, who, for example, opined that the claimant was "at this time" 100% disabled and could not work in anything from desk work to heavy labor due to his infected wound and inability to ambulate (e.g. Exhibit 27F/13). The undersigned accords this opinion little weight. Whether a claimant can work or is disabled is an issue reserved for the Commissioner (20 CFR 416.927(d)). The opinion that the claimant cannot perform any work is also overly restrictive and inconsistent with the longitudinal record, as described in the analysis of the Disability Determination Services consultant opinions, above.

The undersigned considered various treatment notes throughout the record describing the claimant as "disabled" (e.g. Exhibits 16F/l 19/123), as well as notes by Damien Billow, MD, and Tony Abduulkarim, PA-C, for example, indicating that the claimant cannot return to work for various periods of time (e.g. Exhibits 15F, l 7F). Insomuch as these notes constitutes opinions, the undersigned accords them little weight. It is at times unclear who made the aforementioned notes (though it appears likely to be a "Dr. Khawarn," and/or Zane Maroney, MD). Whether a claimant can work or is disabled is an issue reserved for the Commissioner (20 CFR 416.927(d)). It is at times unclear whether these statements were made based upon the claimant's subjective complaints and what criteria these treatment providers might be using when making these statements. Such statements are also inconsistent with the longitudinal record, as described in the analysis of the Disability Determination Services consultant opinions, above.

(*Id.* at 175-76.)

Here, the issue is whether substantial evidence supports the ALJ's determination that Lesure did not demonstrate an inability to ambulate effectively for at least 12 months. The "inability to ambulate effectively" is defined as follows:

> Inability to ambulate effectively means an extreme limitation of the ability to
> walk; i.e., an impairment(s) that interferes very seriously with the individual's
> ability to independently initiate, sustain, or complete activities.  Ineffective
> ambulation is defined generally as having insufficient lower extremity
> functioning (see 1.00J) to permit independent ambulation without the use of a
> hand-held assistive device(s) that limits the functioning of both upper
> extremities.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 1.00B2b(1).  The regulations provide further guidance

regarding effective ambulation, as follows:

> To ambulate effectively, individuals must be capable of sustaining a
> reasonable walking pace over a sufficient distance to be able to carry out
> activities of daily living.  They must have the ability to travel without
> companion assistance to and from a place of employment or school.
> Therefore, examples of ineffective ambulation include, but are not limited to,
> the inability to walk without the use of a walker, two crutches, or two canes,
> the inability to walk a block at a reasonable pace on rough or uneven surfaces,
> the inability to use standard public transportation, the inability to carry out
> routine ambulatory activities, such as shopping and banking, and the inability
> to climb a few steps at a reasonable pace with the use of a single hand rail.
> The ability to walk independently about one's home without the use of
> assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 1.00B2b(2).

Substantial evidence supports the ALJ's conclusion that Lesure does not meet the requirements of

Listings 1.02A and 1.03.  Lesure does not argue there is any evidence the ALJ ignored or overlooked.

(Doc. No. 14 at 13-17.)  Indeed, it is clear from a review of the decision that the ALJ considered the

testimonial, medical, and opinion evidence regarding Lesure's orthopedic impairments.[3]  (Tr. 173-74.)

The ALJ acknowledged Lesure's testimony that he had been in a wheelchair on and off since 2011, that he

cannot walk or stand, and that he could only take a few steps without his wheelchair.  (*Id.* at 173.)

However, as the ALJ found, the evidence regarding Lesure's ability to walk was mixed.  (*Id.* at 174.)  As

of February 28, 2017, the state agency reviewing physician considered the applicability of the listings,

---

[3] The Court notes its surprise at the ALJ condensing Lesure's thousands of pages of medical records into a
few paragraphs, but again, Lesure does not argue the ALJ ignored, overlooked, or otherwise failed to
discuss relevant medical evidence.

including Listing 1.02, and did not find any listing to be met or equaled.  (*Id.* at 226-28.)  Lesure does not challenge the ALJ's determination that the state agency reviewing physicians' opinions were consistent with the longitudinal record and the mixed evidence regarding Lesure's orthopedic impairment.  On September 19, 2017, Lesure went to South Pointe Hospital for treatment for his leg pain and told Dr. Cicchiani the reason he had pain was because he had been on his feet and had not been home to take his Percocet.  (*Id.* at 1664.)  The ALJ cited an April 13, 2018 visit with Dr. Maheswari documenting Lesure's complete independence with his activities of daily living, a grossly normal gait, and equal 5/5 muscle strength of the bilateral lower extremities.  (*Id.* at 174, 1994-95.)  The ALJ also provided a detailed explanation for why she assigned only partial weight to Ontko's functional capacity evaluation, and ultimately found "the opinion does carry come weight in that it reinforces inconsistencies between the claimant's allegations and the longitudinal record . . . ."  (*Id.* at 176.)  It is the ALJ who "'has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record.'"  *Elliott v. Comm'r of Soc. Sec.*, No. 5:17 CV 2140, 2019 WL 400537, at *12 (N.D. Ohio Jan. 31, 2019) (citing *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 800-01 (6th Cir. 2004)) (additional citation omitted).

While Lesure argues persuasively that his ability to stand at the hearing does not bear on whether he could ambulate effectively, it does go to his overall credibility as he also testified he could not stand at all.  (*Id.* at 173, 191.)  Lesure does not challenge the ALJ's credibility assessment.  The Court disagrees that the ALJ's "citation" to Lesure's muscle strength and "his ability to periodically bear weight" has no bearing on his ability to effectively ambulate, as it arguably goes to Lesure's credibility and weight of the evidence.  Again, Lesure does not challenge the ALJ's credibility assessment, and it is the ALJ's duty, and not this Court's, to weigh the evidence.

In addition, the fact the ALJ determined Lesure needed a wheelchair or ambulatory aid as part of his RFC does not mean there is "no dispute" Lesure can ambulate effectively as defined by the regulations.  It is not inconsistent for the ALJ to determine Lesure could ambulate effectively as defined above but still need his wheelchair or other ambulatory aid in order to carry out work activities throughout an eight-hour workday.  *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 1.00B2b(2).

Finally, although the ALJ's discussion of Listings 1.02 and 1.03 at Step Three is brief, the ALJ referenced her analysis at Step Four when analyzing Lesure's orthopedic impairments at Step Three.  At Step Four, the ALJ made sufficient factual findings (discussed at length above) to support her Step Three conclusion and to enable the Court to meaningfully review the decision.  *See Goddard v. Berryhill*, No. 1:16CV1389, 2017 WL 2190661, at *17 (N.D. Ohio May 1, 2017); *Rainey-Stiggers v. Comm'r of Soc. Sec.*, No. 1:13cv517, 2015 WL 729670, at *7 (S.D. Ohio Feb. 19, 2015); *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x. 359, 366 (6th Cir. 2014) (and cases cited therein).  *See also Kern v. Comm'r of Soc. Sec.*, No. 2:16-cv-57, 2017 WL 1324609, at *2 (S.D. Ohio April 11, 2017) ("The Commissioner's decision may be upheld where the ALJ made sufficient factual findings elsewhere in his decision to support the conclusion at step three.").

While the Court acknowledges there is evidence in the record that supports Lesure's argument, the ALJ's findings herein are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *See Buxton*, 246 F.3d at 772-3; *Her*, 203 F.3d at 389-90.  Rather, as noted above, the substantial evidence standard presupposes "there is a zone of choice within which the [ALJ] may proceed without interference from the courts."  *Felisky*, 35 F.3d at 1035.  "This 'zone of choice' includes resolving conflicts in the evidence and deciding questions of credibility."  *Postell v. Comm'r of Soc. Sec.*, No. 16-13645, 2018 WL 1477128, at *10 (E.D. Mich. Mar. 1, 2018), *report and recommendation adopted by* 2018 WL 1471445 (E.D. Mich. Mar. 26, 2018).  Here, the ALJ's

Step Three findings that Lesure did not meet or equal the requirements of Listings 1.02 and 1.03 are within that "zone of choice" and thus supported by substantial evidence.

**B.      Second Assignment of Error: Sentence Six Remand**

Lesure argues this matter should be remanded under sentence six of 42 U.S.C. 405(g) for consideration of evidence post-dating the ALJ's hearing decision that Lesure argues is new, material, and that he has good cause for failing to present to the ALJ.  (Doc. No. 14 at 18-19.)  Lesure argues the Appeals Council incorrectly determined "this evidence did not show a reasonable probability of changing the outcome of the decision or did not relate to the period at issue."  (*Id.* at 18) (citation omitted).  Lesure maintains this was "not an accurate evaluation of the evidence."  (*Id.*)  Lesure asserts the new evidence showed "continuing infection" of his leg, and at the time of the hearing Lesure was considering an attempt to salvage his leg or amputation.  (*Id.* at 19-20.)  Further, Lesure maintains this new evidence, which shows Lesure underwent a below-knee amputation, "also would have raised the issue of meeting or equaling the listings under 20 CFR Part 404, Subpart P, Appendix 1, Section 1.05 – amputation due to any cause."  (*Id.* at 19.)

The Commissioner argues the additional evidence is "not time-relevant," as these medical records are dated February to March 2019, several months after the ALJ issued her hearing decision.  (Doc. No. 17 at 13.)  Therefore, these records do not reflect Lesure's condition during the relevant period.  (*Id.* at 14.)  The Commissioner asserts the February 2019 medical evidence shows Lesure had a new injury to his leg, which worsened his condition.  (*Id.*)  Finally, the Commissioner argues that even if these records related back to Lesure's condition during the relevant time-period, "they fail to support a reasonable probability that a different conclusion should be reached."  (*Id.*)

The Sixth Circuit has repeatedly held "evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review."  *Foster v.*

*Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  A district court can, however, remand the case for further administrative proceedings in light of such evidence, if a claimant shows the evidence satisfies the standard set forth in sentence six of 42 U.S.C. § 405(g).  *Id.  See also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir.1996); *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 717 (6th Cir. 2013) (stating that "we view newly submitted evidence only to determine whether it meets the requirements for sentence-six remand").  Sentence Six provides that:

> The court may ... at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

42 U.S.C. § 405(g).

Interpreting this statute, the Sixth Circuit has held that "evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.'" *Foster*, 279 F.3d at 357 (quoting *Sullivan*, 496 U.S. at 626).  Evidence is "material" only if "there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.'" *Id.* (quoting *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988)).  *See also Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007) (noting that evidence is "material" if it "would likely change the Commissioner's decision."); *Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 725 (6th Cir. 2012) (same).  Evidence is not material if it is cumulative of evidence already in the record, or if it merely shows a worsening condition after the administrative hearing.  *See Prater v. Comm'r of Soc. Sec.*, 235 F. Supp. 3d 876, 880 (N.D. Ohio Feb. 14, 2017).  *See also Jones v. Comm'r of Soc. Sec.*,

336 F.3d 469, 478 (6th Cir. 2003); *Sizemore*, 865 F.2d at 712 ("Reviewing courts have declined to remand disability claims for reevaluation in light of medical evidence of a deteriorated condition"); *Deloge v. Comm'r of Soc. Sec.*, 540 F. App'x 517, 519-20 at *3 (6th Cir. 2013) (same).  Similarly, "[t]o be material, the evidence must relate to the time period at issue – i.e., from the alleged onset date through the date of the ALJ's decision." *Malanowksi v. Comm'r of Soc. Sec.*, No. 1:13CV763, 2014 WL 2593960, at *10 (N.D. Ohio June 10, 2014) (citing *Casey v. Sec'y of Helath & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); *Wyatt v. Sec'y of Health & Human Servs.,* 974 F.2d 680, 685 (6th Cir. 1992)).

In order to show "good cause," a claimant must "demonstrat[e] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357.  *See also Willis v. Sec'y of Health & Hum. Servs.*, 727 F.2d 551, 554 (6th Cir. 1984).  "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter*, 479 F. App'x at 725.  Rather, the Sixth Circuit "takes 'a harder line on the good cause test' with respect to timing, and thus requires that the clamant 'give a valid reason for his failure to obtain evidence prior to the hearing.'" *Id.* (quoting *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir.1986)).  This includes "detailing the obstacles that prevented the admission of the evidence." *Courter*, 479 F. App'x at 725.  *See also Bass*, 499 F.3d at 513.

The burden of showing that a remand is appropriate is on the claimant. *See Foster*, 279 F.3d at 357; *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010).  When a district court grants remand pursuant to sentence six, it "neither affirm[s] nor reverse[s] the ALJ's decision, but simply remand[s] for further fact-finding." *Courter*, 479 F. App'x at 725.  *See also Melkonyan v. Sullivan*, 501 U.S. 89, 98, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991).  Under these circumstances, the district court retains jurisdiction and enters final judgment only "after postremand agency proceedings have been completed and their results filed with the court." *Shalala v. Schaefer*, 509 U.S. 292, 297, 113 S.Ct. 2625, 125

L.Ed.2d 239 (1993).  *See also Melkonyan*, 501 U.S. at 98; *Marshall v. Comm'r of Soc. Sec.*, 444 F.3d 837, 841 (6th Cir. 2006).

The Court finds Lesure has not demonstrated a sentence six remand is appropriate.  This evidence is "new," as it post-dates both the administrative hearing and the ALJ decision.  *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 734 (N.D. Ohio June 14, 2005).  However, Lesure must also demonstrate the materiality of this evidence.  This evidence post-dates the period at issue – July 18, 2011 (the alleged onset date) through October 26, 2018 (the date of decision).  Lesure must show these records pertain to his condition before the ALJ's decision.  *See Malanowski*, 2014 WL 2593960, at *10.

With respect to the 2018 records, even assuming these records relate back to the relevant time period, Lesure cannot show there is a reasonable probability the ALJ would have reached a different disposition of Lesure's disability claim given these records.  On July 29, 2018, a little over one month after the hearing, Lesure went to South Pointe Hospital for treatment of rectal bleeding and leg pain.  (Tr. 136.)  Lesure reported he was going to get an amputation "at some point" but he "needed to be on chronic daily antibiotics and is ran out secondary to missing appointments."  (*Id.*)  On September 12, 2018, Lesure went to South Pointe Hospital after being stabbed in the back.  (*Id.* at 149.)  On examination, treatment providers noted Lesure did not have a gait problem.  (*Id.* at 150.)  These records show further non-compliance by Lesure and that Lesure could ambulate effectively.

The Court agrees with the Commissioner that the 2019 records show a deterioration or change in Lesure's condition after the relevant time period.  Lesure sought emergency treatment on February 4, 2019 for complaints of "worsening of his chronic leg pain since bumping it several days ago."  (Tr. 84.)[4]  On February 25, 2019, Lesure sought treatment for "worsening pain from baseline" in his right leg.  (*Id.* at

---

[4] On examination, Lesure had a full range of motion and intact gait.  (Tr. 84.)

40

92.)[5]  In early May 2019, Lesure sought emergency treatment after falling from his wheelchair two days before that caused worsening leg pain and increased drainage.  (*Id.* at 44.)  During this hospital stay, lab work revealed increased white blood cell count, CRP, and ESR, which treatment providers found "concerning for possible worsening osteomyelitis" or "recurrence of R tibial osteomyelitis" and admitted Lesure for antibiotic therapy.  (*Id.* at 36, 42.)  It was only after this most recent admission that Lesure decided to proceed with a below-knee amputation.  (*Id.* at 68-69.)  These records "pertain to Plaintiff's condition after the date of the ALJ's decision" and do not relate back in time.  *Malanowksi*, 2014 WL 2593960, at *10.  Therefore, the evidence cannot be material.  *Id.*

As the Sixth Circuit has explained:

> "Reviewing courts have declined to remand disability claims for reevaluation in light of medical evidence of a deteriorated condition."  *Sizemore*, 865 F.2d at 712; *see also Ferguson*, 628 F.3d at 277-78; *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir.2003). "If in fact the claimant's condition had seriously degenerated, the appropriate remedy would have been to initiate a new claim for benefits as of the date that the condition aggravated to the point of constituting a disabling impairment." *Sizemore*, 865 F.2d at 712.

*Deloge v. Comm'r of Soc. Sec.*, 540 F. App'x 517, 519-20 (6th Cir. 2013).

For all the reasons set forth above, the Court finds Lesure failed to meet his burden to prove a sentence six remand is warranted.

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: September 4, 2020                    *s/ Jonathan Greenberg*
                                           Jonathan D. Greenberg
                                           United States Magistrate Judge

---

[5] On examination, Lesure again had a full range of motion and was able to ambulate.  (*Id.* at 92.)